UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT


JOHN F. CORCORAN,                              :

       PLAINTIFF,                       :

                                               :     No. 3:04CV0946 (SRU)(WIG)
       v.

                                               :

MICHAEL J. ASTRUE,[1]
COMMISSIONER OF SOCIAL SECURITY,    :

       DEFENDANT.                       :

## RECOMMENDED RULING ON PENDING MOTIONS

Plaintiff, John F. Corcoran, has moved this Court pursuant to 42 U.S.C. §§ 405(g) to reverse and/or remand the final decision of the Commissioner of Social Security denying his application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 423 [Doc. # 27]. Defendant, the Commissioner, has moved this Court to affirm the decision [Doc. # 28]. For the reasons that follow, the Undersigned recommends that Plaintiff's motion be denied and that Defendant's motion be granted.

## I.    Factual Background

Plaintiff was born on July 2, 1953. (Tr. 42). He has a high school education. (Tr. 54). His past relevant work experience includes managing a hot dog stand and working as a pattern rebuilder at a local foundry for thirteen years. (Tr. 49, 305). Plaintiff last worked on November 2, 2001, and was laid off when his company moved to Mexico. (Tr. 48). His work involved

---

[1] Michael J. Astrue became the Commissioner of Social Security effective February 12, 2007. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue has been substituted for Commissioner Jo Anne Barnhart as the defendant in this suit.

lifting heavy items that weighed up to 100 pounds (Tr. 305) and frequently lifting (one-third to two-thirds of the day) items weighing twenty pounds.  (Tr. 49).  Prior to being laid off, he worked a significant amount of overtime, sometimes as much as 60 to 70 hours per week.  (Tr. 305).

Plaintiff's medical history dates back to 1975, when he was diagnosed with diabetes mellitus. (Tr. 48, 184). In addition to having insulin dependent diabetes, Plaintiff suffers from sensory neuropathy,[2] retinopathy,[3] chronic obstructive pulmonary disease ("COPD") (smoking related), and macular edema.  Plaintiff has a smoking history of two to two and one-half packs of cigarettes per day for over 25 years and alcohol abuse (Tr. 266), which ended in December 1997 following a fourteen-day hospitalization, during which he nearly died.  (Tr. 77-90).

For more than ten years,[4] Plaintiff has treated with Dr. William A. Petit, Jr., an endocrinologist and director of the Joslin Center for Diabetes at New Britain General Hospital, for his diabetes mellitus.  (Tr. 299).  Dr. Petit's records document the struggles that they have encountered in keeping Plaintiff's blood sugar levels under control and the constant adjustment of his insulin medications. (Tr. 153 - 225, 236-63).  In November of 1997, Plaintiff reported

---

[2]  "Neuropathy" is a functional disturbance or pathological change in the peripheral nervous system, sometimes limited to noninflammatory lesions as opposed to those of neuritis. "Sensory neuropathy" is a neuropathy of the sensory nerves.  Dorland's Illustrated Medical Dictionary at 1132 (28th ed. 1994).

[3]  "Retinopathy" refers to retinal changes occurring in long-term diabetes and characterized by punctate hemorrhages, microaneurysms, and sharply defined waxy exudates. Dorland's at 1455.

[4] Prior thereto, he was treated by Dr. Sayedur Rahman.  (Tr. 98). The administrative record does not contain Dr. Rahman's treatment records.

slightly elevated glucose levels in the morning, some intermittent difficulties with folliculitis[5] in his left upper extremities, a chronic cough related to smoking two and one-half packs of cigarettes a day, stable vision, a few hypoglycemic episodes[6] that he had been able to treat because he had hypoglycemic awareness,[7] no difficulties with his feet, and some atypical upper chest pain that he associated with heavy lifting at work. (Tr. 223). Dr. Petit noted that Plaintiff had been seen in the Bristol Emergency Room on August 24, 1997, for epigastric and abdominal pain, nausea, and vomiting and an elevated blood alcohol level. (Tr. 224). Dr. Petit's impression was Type I diabetes mellitus, under reasonable control, complicated by mild neuropathy and pre-proliferative retinopathy, hypertension, and COPD, secondary to tobacco abuse. (Tr. 223-24).

In January 1998, Plaintiff was seen by Dr. Petit after his December 1997 hospitalization when he "nearly died" secondary to delirium tremens. (Tr. 220). He had started wearing glasses for reading, occasionally experienced nocturia[8] and polyuria,[9] and had a few incidents of hypoglycemia. (Tr. 220). Five months later, when Plaintiff saw Dr. Petit, he complained that he

---

[5] "Folliculitis" refers to an inflammation of the hair follicles. Dorland's at 647,

[6] "Hypoglycemia" is a deficiency of glucose concentration in the blood, which may lead to tremulousness, cold sweats, piloerection, hypothermia, headache, accompanied by irritability, confusion, hallucinations, bizarre behavior, and ultimately convulsions and coma. Dorland's at 806.

[7] "Hypoglycemic awareness" refers to a patient's ability to recognize that he or she has low blood sugar. The significance of a diabetic patient having hypoglycemic awareness is that if the patient is aware that his or her blood sugar levels have dropped to the point that he or she is hypoglycemic, the patient can self treat to avoid a black-out or other consequences of low blood sugar. See generally http://www.ianblumer.com/hypoglycemia.htm.

[8] "Nocturia" is excessive urination at night. Dorland's at 1142.

[9] "Polyuria" refers to the passage of an excessive amount of urine at one time, a characteristic of diabetes. Dorland's at 1333.

was having a hard time reading.  He had experienced a few episodes of hypoglycemia with the typical symptoms.  He was working over 65 hours per week.  (Tr. 219).  In November 1998, Plaintiff's vision was described as "stable," he was having occasional nocturia, hypoglycemia in the morning, usually with hypoglycemic awareness.  (Tr. 217).  He was still working 65 or more hours per week.  (Tr. 217).

In March 1999, Plaintiff told Dr. Petit that he was having nocturia, but that he was not experiencing any hypoglycemia.  He did indicate that his hands were cramping up at night.  (Tr. 215).  Five months later, Plaintiff reported that his vision was "OK," that he had occasional nocturia, and that he experienced hypoglycemia at around 4:00 p.m. in the afternoons.  (Tr. 212).  Dr. Petit's report from December 1999 describes Plaintiff's vision as "pretty good" and states that he was experiencing hypoglycemia, which he was self-regulating.  (Tr. 210).

In May of 2000, Plaintiff reported to Dr. Petit that he was having frequent hypoglycemic episodes (nine per month in the morning and one per month in the evening), and that he had partial hypoglycemic awareness. (Tr. 206).  He was also experiencing foot cramps at night.  (Tr. 206).   In August of 2000, Dr. Petit's report indicates that Plaintiff was feeling better and his blood sugar levels had dramatically improved.  He was working 60 to 70 hours per week.  His vision was stable and he was using over-the-counter reading glasses.  He was having occasional nocturia, as well as occasional hypoglycemia, which he was able to self-treat.  His feet were feeling better.  He complained of occasional shortness of breath, but the doctor noted that he was getting little exercise outside of work because of his long work hours.  He continued to smoke two and one-half packs per day, but was using no alcohol at all.  Dr. Petit's impression was Type I diabetes mellitus under improving control, complicated by background retinopathy and mild

proliferative sensory neuropathy, GERD (gastroesphogeal reflux disease), COPD, stage I hypertension controlled, and Type IIA hyperlipidemia.[10] (Tr. 196-97).

In January 2001, Plaintiff reported that he was experiencing hypoglycemia with hypoglycemic awareness. (Tr. 195). In June, Plaintiff reported that he was experiencing hypoglycemia rarely and that he was aware when his blood sugar level dropped. (Tr. 191). In November, Plaintiff again reported occasional hypoglycemia and hypoglycemic awareness and occasional nocturia. (Tr. 190).

In February 2002, Dr. Petit's notes indicate that Plaintiff was having occasional nocturia, hypoglycemia in the morning, two times per month, and that he was aware of when his blood sugar level had dropped. (Tr. 188). In June, Dr. Petit reported that Plaintiff had been out of work for several months. He was "doing well" but was basically sedentary at home "'not doing much.'" (Tr. 183). He was still smoking two and one-half packs of cigarettes a day. He denied any hypoglycemic symptoms. He denied any history of nocturia or polyuria. He denied any foot problems or chest pain but did admit to occasional dyspnea, which he attributed to his smoking. (Tr. 183-84). No hypoglycemia was noted. (Tr. 186). The doctor's assessment was Type I diabetes mellitus, which is uncontrolled. Plaintiff was counseled to quit smoking. (Tr. 184). In August and October 2002, Plaintiff suffered two hypoglycemic black-outs, which required treatment at the emergency room. (Tr. 127-40). In September, Dr. Petit's notes indicate that Plaintiff's hypoglycemic awareness had decreased lately. (Tr. 180). In November, Dr. Petit noted that Plaintiff's diabetes mellitus was uncontrolled and that he often did not feel

---

[10] "Hyperlipidemia" is another term for high cholesterol and refers to an excess of lipids in the blood. Dorland's at 795.

hypoglycemic. (Tr. 160). Dr. Petit next saw Plaintiff on December 17, 2002,[11] for a follow-up evaluation and management of his diabetes mellitus. His blood sugar levels showed "some hypoglycemia, almost always at lunch . . . one at breakfast . . . but none in the afternoon" with his highest numbers in the mid-afternoon and dinnertime. (Tr. 153). "He has had no severe hypoglycemia, only mild and . . . his vision has been stable." (Tr. 153). Dr. Petit adjusted his insulin levels, strongly urged him to quit smoking, and recommended an exercise stress test in light of his multiple risk factors. (Tr. 154).

In August 2003, Dr. Petit, at Plaintiff's request, wrote Plaintiff's counsel, stating:

> Mr. Corcoran has very labile blood glucose levels which often cause him to have severe hypoglycemia which comes without any awareness. He has blacked out several times and has needed to have Emergency Room visits for management of his hypoglycemia. The unpredictability of his glucose makes it very difficult for him to function. This would probably pose a problem for him in maintaining any type of employment. His visual acuity has also been worsening which would make employment difficult if there was any reading involved or fine motor work. At this time, it is doubtful that either of these conditions would actually improve enough to enable him to return to work on a regular basis.

(Tr. 236) (emphasis added).

In December 2003, Dr. Petit again wrote Plaintiff's attorney, stating that he had read the Social Security Administration's decision as well as the opinion of the State agency doctors. He stated, "I certainly cannot disagree that Mr. Corcoran remains capable of light work activities. Many of his physical capabilities are not the issue. The problem that Mr. Corcoran is running into is the brittleness of his blood sugar control. We have been struggling over the past several years

_____

[11] Presumably this report is the record received by the State Agency on January 8, 2003, since this is the last record before that date. See Discussion at 10, infra.

attempting to stabilize his glycemic control, that is to say his blood sugar levels are very labile."
(Tr. 290) (emphasis added).  Dr. Petit then related that Plaintiff had been very diligent in
monitoring his blood sugar levels and had been working hard to monitor his diet, which had
resulted in a decrease in the deviation of his blood sugar range although it still remained quite
significant.  (Tr. 290).  He further noted that Plaintiff often had hypoglycemic unawareness,
meaning that he would not be aware that his blood sugar level had fallen.  If his blood sugar level
dropped low enough, he could faint or have a seizure, which had been Dr. Petit's "big concern"
with Plaintiff.  (Tr. 291).   However, he stated that he believed that "at some level he would be
capable of working, if he would be able to do his job in a safe, monitored environment, perhaps
at a desk," but that due to his susceptibility to hypoglycemia, he should not be allowed to operate
machinery, which could hurt others or himself if he were to pass out or have a seizure.  (Tr. 291)
(emphasis added).   Dr. Petit also noted that Plaintiff had some decreased sensation in his feet
and fingers, as well as background retinal changes and macular edema that caused some
impairment of vision.  (Tr. 291).

The following month, Dr. Petit again wrote Plaintiff's counsel, reiterating that Plaintiff
was struggling with his diabetes and working hard at his glycemic control.  He was on a multiple
daily injection routine to attempt to decrease the "ups and downs."  (Tr. 292).  Overall, Dr. Petit
felt that he was doing a bit better but that they still had a long way to go.  He was having some
hypoglycemia nearly every day, often without symptoms.  He stated that he would "still maintain
that it is unsafe for Mr. Corcoran to work because of his hypoglycemic unawareness."  (Tr. 292)
(emphasis added).  He suggested that the next step might be for him to continue "subcutaneous
insulin therapy or pump therapy" because of the problems he was having with his current insulin

regimen. (Tr. 292).

Plaintiff has also suffered from optical problems related to his diabetes, for which he has treated by ophthalmologist, Dr. Charles Robinson. (Tr. 101-26, 264-65). Plaintiff underwent laser treatment for diabetic macular edema of both eyes in 1995. (Tr. 119-26). The treatment was repeated on his left eye in September of 1999 and 2002 (Tr. 105-06, 116-18) and on the right eye in September of 2001 and 2002. (Tr.109, 112-15).

As noted above, in December 1997, Plaintiff was hospitalized for fourteen days in critical condition. The records from Bristol Hospital indicate that Plaintiff had stopped taking his insulin three days prior to his admission, he had been drinking excessively, and had been vomiting blood for several days. (Tr. 77). Upon admission, he was experiencing diabetic ketoacidosis,[12] gastrointestinal bleeding, severe delirium tremens, and severe derangement of his electrolytes. (Tr. 86, 90). During that hospitalization, he was treated for hemorrhagic gastritis secondary to alcohol abuse and possibly stress, uncontrolled diabetes ketoacidosis, bronchopneumonitis, alcohol and tobacco abuse, encephalopathy, and dysphagia.[13] (Tr. 77-99). He was discharged to Medi-Plex Intermediate Care Hospital. (Tr. 81).

In January 2003, Plaintiff was evaluated by cardiologist Dr. James St. Pierre for atypical chest pain, which Plaintiff described as "chest cramping" that occurred about once a week for five to ten minutes, an abnormal EKG, and multiple cardiac risk factors. (Tr. 266-68). On February 27, 2003, angiographies were performed which revealed no obstructive coronary artery

---

[12] "Ketoacidosis" is acidosis accompanied by the accumulation of ketone bodies in the body tissues and fluids. Dorland's at 881.

[13] "Dysphagia" is a difficulty in swallowing. Dorland's at 517.

disease.  (Tr. 282-83).

## II.    Procedural History

Plaintiff first submitted an application for disability insurance benefits ("DIB") on

October 18, 2002. (Tr. 42). In his application he alleged that he has not been able to work since

November 2, 2001 due to diabetes, high cholesterol, hypertension, and leg cramps. (Tr. 42, 48).

He  also stated that on November 2, 2001 he stopped working because his employer had laid him

off and subsequently moved its operations to Mexico. (Tr. 48, 299). In a questionnaire dated

October 28, 2002, he stated that he was receiving unemployment compensation.  In order to

maintain his entitlement to unemployment compensation, Plaintiff indicated that he spent about

an hour a day driving through industrial areas looking for "help wanted" signs.  (Tr. 57). In that

same questionnaire, Plaintiff stated that he was afraid to "get real active for fear that [his] sugar

[would] go down." (Tr. 64, 57, 65).  He stated that he experienced symptoms of light-headedness

once or twice a week.  (Tr. 66).  He reported that he lived in a duplex, where he did his own

housework, laundry, cooking, snow shoveling, and trimming of shrubs.  His brother, who lived in

the upstairs half of the duplex, did the yard work.  (Tr. 58-59).  Plaintiff said that he went out

everyday and was able to walk and drive a car.  He used to drive long distances into the country,

but quit doing that in an effort to cut his expenses once he was out of work.  (Tr. 62). He stated

that he wore "1.5 power" reading glasses, purchased at the store. (Tr. 62). Otherwise, he reported,

his ability to sit, climb stairs, lift, stand, reach, hear, talk, squat, kneel, and use his hands was

unaffected by his illnesses and medical conditions.  (Tr. 62).  He also responded that he was able

to follow directions and pay attention.  (Tr. 63).

A Physical Residual Functional Capacity ("RFC") Assessment dated December 9, 2002,

by State agency consultant, Dr. Malone, indicated that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk six hours in an eight-hour work day, and sit six hours in an eight-hour work day. Dr. Malone rated Plaintiff's ability to push and/or pull as unlimited, other than as noted above for lifting. (Tr. 142). Dr. Malone noted occasional postural limitations in all categories, except climbing ladders/ropes/scaffolds, which was "never." (Tr. 144). She reported no visual limitations, his visual acuity being 20/20 without correction (Tr. 143, 145, 151), and no manipulative or communicative limitations. (Tr. 145, 146). The only environmental limitation reported was for Plaintiff to avoid even moderate exposure to hazards, such as machinery and heights. (Tr. 146). She concluded that Plaintiff had the RFC to function at the light level of exertion. (Tr. 147).

Based on this RFC Assessment, and the reports of Dr. William Petit, Dr. Charles R. Robinson, and the Bristol Hospital records, Plaintiff's application for disability insurance benefits was initially denied on December 13, 2002. (Tr. 23, 25-28). Plaintiff sought reconsideration, alleging that his condition had worsened due to a loss of feeling and numbness in both hands, which made it difficult for him to hold things. (Tr. 68). Plaintiff's claim was reviewed by a State agency physician and a disability specialist. The second RFC Assessment dated January 31, 2003, by Dr. Golkar showed the same exertional limitations. All postural limitations were marked as "occasional." There were no communicative, visual or manipulative limitations noted, and the only environmental limitations were to avoid concentrated exposure to extreme heat and cold, fumes, odors, dusts, gases, poor ventilation, and vibration. (Tr. 226-233). Additionally, the State Agency had the benefit of a new report from Dr. William Petit, received January 8, 2003. (Tr. 31). On February 4, 2003, the State Agency denied his application on

reconsideration. (Tr. 31-34).

Thereafter Plaintiff submitted a request for a hearing which was held before Administrative Law Judge ("ALJ") Dolan on September 16, 2003. (Tr. 294-316). Plaintiff, who was represented by counsel, testified at the hearing. (Tr. 298-307). He stated that he was afraid to work because of the fluctuations in his blood sugar levels, which could cause him to black out and made him afraid that he might hurt himself or someone else. (Tr. 299-300, 303). He testified that he can no longer do yard work or snow shoveling because he gets light-headed and dizzy when he bends over. (Tr. 300-01). He described his typical day as taking a shower, checking his blood sugar levels, getting breakfast, then going to a park to read the paper, coming home, watching television, performing a little housework, fixing lunch, repeating his blood sugar tests, and then the same thing at supper. (Tr. 302). Sometimes he suffered from nocturia, depending on his blood sugar levels. (Tr. 302). He also testified that in the past year, he has started to experience numbness in his hands, and his eye doctor told him that he would have to wear glasses for reading. (Tr. 303). In response to questions from the ALJ, Plaintiff testified that, sometimes as often as two or three times a week, he feels as if he is going to black out, but at other times, he will not experience this for two to three weeks. (Tr. 305). He also stated that he had problems with his legs cramping, which limited his ability to stand to only an hour or so. He testified that he had no problems sitting for extended periods of time, and had no memory problems. (Tr. 306).

Dr. Morton Solomon, a board-certified internist who had reviewed Plaintiff's medical records, also testified at the hearing as a medical expert. (Tr. 307-15). He noted that although there was evidence that Plaintiff had some sensory neuropathy, there was "no impairment of gait

or fine and dexterous motion." (Tr. 308). He found no evidence of any visual impairment. (Tr. 308). Plaintiff's problem was recurrent hypoglycemia. Plaintiff's blood sugar levels, he explained, are controlled by three things: the amount of insulin he takes, the amount of activities he performs, and what he eats. He stated that there was no evidence of non-compliance by Plaintiff. (Tr. 308). Dr. Solomon agreed with Plaintiff that exertion could bring on a hypoglycemic episode and noted that Plaintiff's doctor had told him that if he were going to do yard work, he should decrease his insulin. As to the exact amount, that would have to be determined by trial and error. (Tr. 310). He disagreed, however, with Dr. Petit's opinion that Plaintiff's hypoglycemia and visual problems could not improve. (Tr. 315). He testified that people with diabetes do work at machinery, but that if Plaintiff had repeated episodes of syncope that were completely uncontrollable, he should not be in an industrial environment. (Tr. 310).

The ALJ delivered his opinion on December 3, 2003 (Tr. 12) and found that Plaintiff was not disabled within the meaning of the Social Security Act through the date of his decision because he retained the RFC to perform light work and based on his RFC, age, education, and work experience, the Medical-Vocational Guidelines, commonly referred to as "the Grids," Rules 202.14 and 202.21, Table No. 2, App. 2, Subpt. P, Reg. No. 4, dictated a finding of "not disabled." (Tr. 20 & 21). This decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review on April 9, 2004. (Tr. 6-9). Plaintiff now moves this Court to reverse the Commissioner's decision or alternatively remand for further proceedings.[14] Defendant has moved for an order affirming the Commissioner's decision.

---

[14] Plaintiff previously filed a motion to remand this case to the Appeals Council, which was denied on July 18, 2006.

### III.    Standard for Determining Disability

A finding of disability is appropriate when an individual is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A "'physical or mental impairment' is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).  A disability will only be found if an individual's "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 423(d)(2)(A).

### IV.    Decision of the ALJ

In order to make a disability determination the ALJ must perform a five-step sequential evaluation of the evidence. 20 CFR § 404.1520; see Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002). If the ALJ determines "(1) that the claimant is not working, (2) that he has a 'severe impairment,' (3) that the impairment is not one that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the [ALJ] must find him disabled if (5) there is not another type of work the claimant can do." Draegert, 311 F.3d at 472 (citing 20 CFR § 404.1520(b)-(f)).

At the first step of the evaluation, the ALJ found that Plaintiff had not performed substantial gainful work activity since November 2, 2001. (Tr. 16, 21). The ALJ next determined that the medical evidence established that Plaintiff has severe impairments including diabetes mellitus, sensory neuropathy, retinopathy, COPD (smoking related), and macular edema. (Tr. 16, 21). At the third step, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the requirements of a listed impairment contained in the "Listings," 20 C.F.R. App. 1, Subpt. P, Reg. No. 4. (Tr. 19, 21). Because this finding bars a presumption of disability, the ALJ made his fourth inquiry as to Plaintiff's RFC and determined that Plaintiff did not have the capacity to return to his past relevant work. (Tr. 20, 21).[15] Finally, "[o]nce a disability claimant proves that his severe impairment prevents him from performing his past work [i.e., at step four], the [Commissioner] then has the burden of proving that the claimant still retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy." Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (quoting Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986)). In order to make this determination, the ALJ, in the usual case, will resort to the Medical-Vocational Guidelines, 20 C.F.R. Pt. 404, Subpt. P, App. 2 (1986). Id. at 78 (quoting Bapp, 802 F.2d at 608). The ALJ, using these Guidelines, thus determined that based on Plaintiff's RFC, age, education, and work experience, Rules 202.14 and 202.21, Table No. 2, App. 2, Subpt. P, Reg. No. 4, directed a conclusion of "not disabled." (Tr. 20, 21).

V.      **Standard of Review**

---

[15] The ALJ determined that the Plaintiff was capable of "light work" and thus incapable of returning to his past work which required medium to heavy exertion. (Tr. 20).

      "The district court's review of the Commissioner's decision regarding disability is limited to a determination of whether the decision is supported by 'substantial evidence' in the record as a whole. 'Substantial evidence' means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002) (internal quotations and citations omitted). Thus, "[w]here the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, [the Court] will not substitute [its] judgment for that of the Commissioner." Id.

      "Such a deferential standard, however, is not applied to the Commissioner's conclusions of law. This Court must independently determine if the Commissioner applied the correct legal standards in determining that the plaintiff was not disabled. Failure to apply the correct legal standards is grounds for reversal." Stiggins v. Barnhart, 277 F. Supp. 2d 239, 243 (W.D.N.Y. 2003) (internal quotations and citations omitted). "In its review, this Court must first review the legal standards applied, and then, if the standards were correctly applied, determine whether the Commissioner's decision is supported by substantial evidence." Id. (citing Johnson v. Bowen, 817 F.2d 983, 985 (2d Cir. 1987)).

## VI.    Discussion

    A.    <u>Whether the ALJ Afforded the Proper Weight to the Opinion of Plaintiff's Treating Physician</u>

Plaintiff argues that the "Commissioner failed to properly evaluate the opinions of his treating sources within the parameters of the regulations and SSR 96-2p.[16]" (Pl.'s Mem. at 4).

---

[16] Social Security Ruling 96-2p, entitled "Policy Interpretation Ruling Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions," July 2, 1996, provides in

Specifically Plaintiff claims first, that "the ALJ failed to apply the relevant factors in determining how much weight to give to the opinion of the treating source" and second, that "the ALJ ignored the opinions of the treating health sources with regard to functional capacity." (Pl.'s Mem. at 5).

"The Commissioner has promulgated regulations regarding the evaluation of treating physicians' opinions which the district court is bound to apply. The regulations require that more weight be given to opinions from treating sources because those sources are more likely to have

_____

relevant part:

> Controlling weight. This is the term used in 20 C.F.R. § 404.1527(d)(2) and § 416.927(d)(2) to describe the weight we give to a medical opinion from a treating source that must be adopted. The rule on controlling weight applies when all of the following are present:
>
> > 1. The opinion must come from a "treating source," as defined in 20 C.F.R. § 404.1502 and § 416.902. . . .
> >
> > 2. The opinion must be a "medical opinion." Under 20 C.F.R. § 404.1527(a) and § 416.927(a), "medical opinions" are opinions about the nature and severity of an individual's impairment(s) and are the only opinions that may be entitled to controlling weight. . . .
> >
> > 3. The adjudicator must find that the treating source's medical opinion is "well-supported" by "medically acceptable" clinical and laboratory diagnostic techniques. The adjudicator cannot decide a case in reliance on a medical opinion without some reasonable support for the opinion.
> >
> > 4. Even if well-supported by medically acceptable clinical and laboratory diagnostic techniques, the treating source's medical opinion also must be "not inconsistent" with the other "substantial evidence" in the individual's case record.
>
> If any of the above factors is not satisfied, a treating source's opinion cannot be entitled to controlling weight. It is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the case record. However, when all of the factors are satisfied, the adjudicator must adopt a treating source's medical opinion irrespective of any finding he or she would have made in the absence of the medical opinion.

detailed knowledge and understanding of the medical impairment." <u>Gonzalez v. Apfel</u>, 23 F. Supp. 2d 179, 192 (D. Conn. 1998) (internal citations omitted). In determining the weight to be afforded to the treating physician's opinion, the Second Circuit applies the following factors: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors." <u>Schaal v. Apfel</u>, 134 F.3d 496, 503 (2d Cir. 1998) (citing 20 C.F.R. § 404.1527(d)(2)). "The Second Circuit has repeatedly said that the opinion of the treating physician is given controlling weight if it is supported by medical findings and not inconsistent with substantial evidence." <u>Shine v. Barnhart</u>, No. 3:02CV1482(JCH), 2004 WL 834642, at *17 (D. Conn. Mar. 8, 2004) (citing <u>Rosa</u>, 168 F.3d at 78-79). However, it is axiomatic that "the treating physician's opinion does not get controlling weight when other evidence in the record conflicts with the treating physician's opinion. The less consistent that opinion is with the record as a whole, the less weight it will be given." <u>Wright v. Barnhart</u>, 473 F. Supp. 2d 488, 493 (S.D.N.Y. 2007) (citing <u>Snell v. Apfel</u>, 177 F.3d 128, 133 (2d Cir. 1999)) (internal quotations and citations omitted).  Additionally, "the 1991 Regulations provide that the Commissioner will always give good reasons in [its] notice of determination or decision for the weight [it] give[s] [claimant's] treating source's opinion." <u>Schaal</u>, 134 F.3d at 503-04.

        Here, the ALJ did not give controlling weight to the opinion of  Plaintiff's treating physician,  Dr. William Petit, Jr.  He stated, "although I have considered Dr. Petit's opinion [that the unpredictability of Plaintiff's glucose posed a problem for him to maintain any type of

employment],[17] I do not agree with his conclusion because it is not well supported by acceptable clinical and laboratory techniques and because it is inconsistent with the other substantial evidence of record." (Tr. 17). Upon review of the record, the Court agrees that the ALJ was correct in not affording controlling weight to Dr. Petit's opinion set forth in his August 8, 2003 letter.

Admittedly, Dr. Petit and Plaintiff have had an extensive treatment relationship over the past ten years. (Tr. 153-263). Furthermore, Dr. Petit is a specialist in the treatment of diabetes. He is the Medical Director of the Joslin Center for Diabetes at New Britain Hospital (Tr. 290, 298) and "is long experienced in the field of diabetes." (Tr. 298). However, despite Dr. Petit's specialist status and the longstanding nature of the relationship between Dr. Petit and Plaintiff, there are a number of inconsistencies between Dr. Petit's August 8, 2003 opinion and the evidence of record, including later reports from Dr. Petit himself.

The record establishes that Plaintiff has suffered a long history of diabetes. Indeed, on two occasions in 2002 Plaintiff found himself in New Britain General Hospital's Emergency Room as a result of hypoglycemic black-outs. (Tr. 127-40). However, in a report by Dr. Petit subsequent to these incidents he states that "[Plaintiff] has had no severe hypoglycemia, only mild." (Tr. 153). Furthermore, nowhere in the record is there any indication that Plaintiff had suffered black-outs of this nature either before or after these isolated incidents. Indeed, during this time, where Dr. Petit claims that Plaintiff's unpredictable glucose makes it difficult for him

―――――――――――――

[17] The ALJ is referring to Dr. Petit's August 8, 2003 letter to Plaintiff's counsel. (Tr. 236).

to function, Plaintiff was actually functioning quite well. On Plaintiff's Daily Activities Questionnaire dated October 28, 2002, following the two aforementioned black-outs, Plaintiff stated that he prepares his own meals on a daily basis, performs his own housework, cleans his own laundry, shovels snow off of the porches after snow storms, and helps his brother trim the hedges outside. (Tr. 58-59). Plaintiff also stated that he regularly drives a car alone, and furthermore shops twice a week for food and/or clothing. (Tr. 59-60). At this point Plaintiff was also regularly visiting with friends and frequenting the Bristol Polish Club. (Tr. 61). Furthermore, just one year earlier, when Plaintiff was experiencing hypoglycemic episodes, he was working 60 to 70 hours per week, working with and around machinery, and performing strenuous manual labor that required him to lift up to 100 pounds.

Although the record reflects the difficulties that Plaintiff was having in controlling his blood sugar, Dr. Petit provided Plaintiff with steps to take in order to better manage his hypoglycemia so that Plaintiff could maintain his functioning lifestyle. For example, Dr. Petit's office advised him that his "hypoglycemia will occur if meals not eaten on time." (Tr. 168). Dr. Petit further advised Plaintiff that if he planned on participating in physical activities he should reduce his insulin by ten (10) percent (Tr. 186, 310), consume a one hundred (100) calorie snack prior to the activity, continue to snack every thirty (30) minutes and additionally ensure that he has glucose tablets on hand. (Tr. 168). While the record supports Dr. Petit's opinion that Plaintiff should not engage in strenuous physical labor, there is nothing to suggest that he would not be able to work in a job that required only a light level of exertion.

Dr. Petit, in his August 8th report, also stated that Plaintiff's "visual acuity has also been worsening which would make employment difficult if there was any reading involved or fine

motor work. At this time it is doubtful that either of these conditions would actually improve enough to enable him to return to work on a regular basis." (Tr. 236). Again, there are a number of inconsistencies between this statement and the evidence of record. First, at the hearing before the ALJ, the Plaintiff agreed that he could see well when he wore a pair of reading glasses. (Tr. 309). Second, both of the RFC reports indicate that Plaintiff had no visual or manipulative limitations. (Tr. 145, 229). Indeed the first RFC, dated December 9, 2002, states that "[w]hile claimant has diabetic retinopthy it does not appear to interfere with his [visual acuity] at this time." (Tr. 145).[18] Finally, the medical expert who testified at the hearing before the ALJ patently disagreed with Dr. Petit that the Plaintiff's symptoms could not improve and testified that Dr. Petit's opinion to that effect was unsupported by the evidence of record. (Tr. 315).

Furthermore, it is of concern that Dr. Petit provided a number of inconsistent opinions over the course of approximately five months. Dr. Petit's first opinion, dated August 8, 2003, upon which the ALJ relied in his determination, stated that "[t]he unpredictability of [Plaintiff's] glucose makes it very difficult for him to function. This would probably pose a problem for him in maintaining any type of employment." (Tr. 236). Approximately four months later, after the ALJ had determined that the Plaintiff was not disabled, Dr. Petit wrote in a letter to Plaintiff's counsel that he "certainly cannot disagree that Mr. Corcoran remains capable of light work activities" (Tr. 290) and further that he thought that "at some level [Plaintiff] would be capable of working, if he would be able to do his job in a safe, monitored environment, perhaps at a desk." (Tr. 291). Apparently this opinion concerned Plaintiff's counsel, as approximately one

---

[18] Dr. Petit's December 17, 2002 report concerning Plaintiff's followup office visit corroborates this conclusion, as he states that Plaintiff's "vision has been stable." (Tr. 153).

month later in a third letter addressed to counsel, Dr. Petit returned to his original opinion and stated that he "would still maintain that it is unsafe for Mr. Corcoran to work because of his hypoglycemic unawareness." (Tr. 292). Although these inconsistencies did not present themselves to the ALJ, they provide the Court will assurance that the ALJ gave Dr. Petit's opinion appropriate weight and consideration.

The Court would further note that when Dr. Petit's letters are reviewed in their entirety, along with his treatment records, his primary concern – similar to that expressed by Plaintiff at the hearing and in his disability questionnaire – was that upon exertion Plaintiff would experience a hypoglycemic black-out that could put him or others at risk of injury. While Plaintiff's and Dr. Petit's concerns in this regard are certainly understandable, there is nothing in the record to suggest that Plaintiff would not be able to perform light or sedentary work or that such work would exacerbate his chances of a hypoglycemic incident. Indeed, as noted above, in December 2003, after the ALJ rendered his decision, Dr. Petit stated specifically that he did not disagree that Plaintiff remained capable of light work in a safe, monitored environment, perhaps at a desk. (Tr. 290-91). Thus, the Court finds that the ALJ correctly declined to afford controlling weight to Dr. Petit's opinion that Plaintiff could not perform any type of employment. Moreover, the Court would note that Dr. Petit's opinion regarding Plaintiff's ability to do any type of work is not a medical opinion but rather an opinion on the ultimate issue of disability, an issue which is reserved to the Commissioner. See 20 C.F.R. § 404.1527(e); SSR 96-5p.

B.     Whether the ALJ Failed to Make a Proper Credibility Assessment

Plaintiff next contends that "[t]he ALJ failed to make a proper credibility assessment within the context of the Commissioner's regulations." (Pl.'s Mem. at 5). The ALJ accepted

Plaintiff's subjective complaints except to the extent that he alleged that he could only stand for one hour at a time and that he could not perform any type of employment because he feared that his blood sugar fluctuations would result in injury to himself or others.  (Tr. 299-300, 303, 306).  The ALJ found that "[t]he claimant's testimony concerning his symptoms and limitations is less than fully credible." (Tr. 18).  He based his decision on the contradictions between Plaintiff's testimony at the hearing concerning his symptoms and his earlier responses to the disability questionnaire which supported his finding that Plaintiff maintained "activities of daily living consistent with a capacity for work." (Tr. 18).[19]

"It is the function of the [Commissioner], not the reviewing courts, to . . . appraise the credibility of witnesses, including the claimant." Aponte v. Sec'y of Health and Human Servs., 728 F.2d 588, 591 (2d Cir. 1984) (quoting Carrol v. Sec'y of Health and Human Servs., 705 F.2d 638, 642 (2d Cir. 1982)). Such credibility findings must be accepted by the reviewing court unless they are clearly erroneous. Punch v. Barnhart, No. 01 Civ. 3355(GWG), 2002 WL 1033543, at *14 (S.D.N.Y. May 21, 2002).  However, a finding that the witness is not credible must be set forth with sufficient specificity to permit an intelligent review of the record. Williams v. Bowen, 859 F.2d 255, 260-61 (2d Cir. 1988) (citing Carrol, 705 F.2d at 643).

The consistency of a claimant's statements is one factor that the ALJ may take into consideration in assessing his credibility. See Gross v. McMahon, 473 F. Supp. 2d 384, 389

---

[19]  Plaintiff also complains that he relied on the ALJ's statement at the hearing that he "had no reason to doubt the credibility of anything that he had testified to so far" (Tr. 306-07) in not calling his sister-in-law as a corroborating witness.  However, even if Plaintiff's sister-in-law had fully corroborated Plaintiff's testimony at the hearing, it still would have been contradicted by Plaintiff's own answers on the disability questionnaire and other evidence in the record as discussed above.

(W.D.N.Y. 2007) (citing SSR 96-7p).  As noted above, Plaintiff's responses to the disability questionnaire in October 2002, indicated that he was able to perform the functions of daily living, including snow shoveling, clipping hedges, doing laundry, cleaning house, cooking, and driving long distances.  Additionally Plaintiff stated,  "I'm on unemployment so I need to look for work. I spend about an hour a day driving through industrial areas looking for help wanted signs." (Tr. 52). This statement not only suggests that Plaintiff was able to work but also raises a concern about his credibility.  If one is receiving unemployment benefits, there is a presumption that such person is able to work and able to seek employment. That Plaintiff was claiming disability while "on unemployment" is patently contradictory. See, e.g., Barrett v. Shalala, 38 F.3d 1019,1024 (8th Cir. 1994) (finding that ALJ's conclusion that the plaintiff lacked credibility was supported by substantial evidence where the plaintiff claimed disability at the same time he was receiving unemployment benefits). Additionally, while Plaintiff indicated in his disability questionnaire and at the administrative hearing that he did not feel as though he was able to work due to his fear that he might hurt himself or others as a result of a hypoglycemic black-outs, this fear did not prevent him from driving an automobile, which would certainly carry a substantial risk of injury in the event of a hypoglycemic black-out.  (Tr. 299-300, 302-03).

With respect to his alleged inability to stand for more than one hour, there is nothing in the medical records to support this limitation.  The records indicate that Plaintiff took quinine and folic acid for his leg cramps and that the medications were effective.  (Tr. 55, 66).   An arterial doppler study performed in February of 2003 did not show any significant abnormality in either of his legs.  (Tr. 271).   Prior to being laid off in late 2001, Plaintiff had been working twelve-hour days at a job that required standing a significant portion of the time, and in his

disability questionnaire completed in October 2002, he indicated that his illnesses had not affected his ability to stand. (Tr. 62) . There is nothing in the medical records that would explain a sudden and marked deterioration in his ability to stand between October 2002 and the hearing in September 2003 that would support his testimony in this regard.

It seems anomalous that upon being laid off from a job he had held for thirteen years, which required extensive overtime and heavy manual labor (Tr. 190-95,305), and despite having suffered many of the same medical conditions for over twenty-five years, Plaintiff became disabled to the point that he could not engage in any kind of substantial, gainful work, although he was still actively looking for work so that he could collect unemployment benefits. Indeed, up until the time of the lay off, Plaintiff was working between sixty and seventy hours per week (Tr. 305), most of which time he spent on his feet. (Tr. 304). During this time, Plaintiff still suffered from blood sugar fluctuations[20] yet he managed to function normally, even under sometimes heavy exertion, at his former employment.

The Court cannot conclude that the ALJ erred in his assessment of Plaintiff's credibility. The assessment was not clearly erroneous and is not grounds for reversal.

    C.    <u>Whether the ALJ Erred in Finding Plaintiff had the Residual Functional Capacity to Perform Light Work</u>

Lastly, Plaintiff argues that the ALJ erred in finding that Plaintiff had the residual

---

[20] Dr. Petit's records from 2000 and 2001 indicate that Plaintiff was having recurrent episodes of hypoglycemia. (Tr. 190-209).

functional capacity to perform light work.[21] (Pl.'s Mem. at 9). He submits that the evidence of record from treating sources "demonstrates [Plaintiff's] residual functional capacity was impaired to the extent it prevented him from functioning in a competitive work environment on a 'regular and continuing' basis."[22] (Id. at 9-10). The Court disagrees.

The record contains two RFC assessments, performed by separate medical consultants on December 9, 2002 and January 31, 2003, which are both consistent with the requirements of light work. (Tr.141-50, 226-36). Indeed, even with additional evidence from Dr. Petit, Dr. Golkar, who performed the second RFC assessment, still concluded that Plaintiff remained capable of light work. (Tr. 226-36). Furthermore, the medical consultant even noted that the "treating/examining source conclusions about the claimant's limitation or restrictions [were not] significantly different from [his] own findings." (Tr. 232).[23]

Plaintiff's own testimony further supports a finding that he retained the RFC for light work. He stated that he can comfortably remain standing for about an hour or so and further that extended periods of sitting "doesn't really bother [him]." (Tr. 306). In his disability

_____

[21]  Light work involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

[22]  Plaintiff does not argue that he could not perform a significant number of jobs existing in the national economy if he had the RFC to perform light work, as determined by the ALJ. Rather, he challenges only the ALJ's RFC finding.

[23] The medical consultant relied upon chart notes and laboratory results from November and December 2002.

questionnaire, he responded that his ability to sit, climb stairs, lift, stand, reach, hear, talk, squat, kneel, and use his hands was unaffected by his illnesses and medical conditions. (Tr. 62). He also responded that he was able to follow directions and pay attention. (Tr. 63). The fact that Plaintiff remains capable of grocery shopping, housework and occasional snow shoveling also supports the conclusion that he is capable of light exertion.

Moreover, as mentioned above, the record supports a finding that Plaintiff is very capable of functioning in the everyday world. He maintains the ability to care for himself and at the least, the interior of his home. Additionally, at the time Plaintiff submitted his application for DIB he was actively looking for work even after the two isolated black-outs occurred. (Tr. 52). Indeed, Plaintiff admitted in his original application to driving, socializing and shopping on a somewhat frequent basis.

It is also very telling that in a letter following the ALJ's determination that Plaintiff was not disabled, Plaintiff's treating physician, Dr. Petit, agreed that Plaintiff remained capable of light work. (Tr. 290).

> I certainly cannot disagree that Mr. Corcoran remains capable of light work activities. . . . .
>
> I think at some level he would be capable of working, if he would be able to do his job in a safe, monitored environment, perhaps at a desk, but if he is operating machinery throughout the course of the day he is susceptible to this hypoglycemia at any point which could cause him to fall, pass out or to have a seizure, thus perhaps endangering other people he works with as well as himself.

(Tr. 291). This statement precisely confirms the ALJ's RFC finding that Plaintiff was capable of performing work at the light level of exertion. (Tr. 19-20).

-26-

Therefore, the Court finds that substantial evidence supports the ALJ's RFC finding that Plaintiff was capable of performing light work. Having made that determination, the ALJ correctly applied the Grids to find that Plaintiff was not disabled within the meaning of the Social Security Act.

**VII.    Conclusion**

For the foregoing reasons, the Court recommends that Plaintiff's Motion for Order of Reversal of Decision of Commissioner or, in the Alternative, To Remand for Further Proceedings be DENIED [Doc. # 27], and that the Motion of the Commissioner to Affirm the Decision be GRANTED [Doc # 28]. There is substantial evidence in the record to support the Commissioner's finding that Plaintiff is capable of light work and accordingly not disabled.

This is a Recommended Ruling. The parties are advised that any objections to this Recommended Ruling must be filed with the Clerk of the Court within ten (10) days of the receipt of this order. Failure to object within ten (10) days may preclude appellate review. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; D. Conn. L. Civ. R. 72 for Magistrate Judges; FDIC v. Hillcrest Assocs., 66 F.3d 566, 569 (2d Cir. 1995).

SO ORDERED, this __21st__ day of August, 2007 at Bridgeport, Connecticut.


     __/s/ William I. Garfinkel_____
     WILLIAM I. GARFINKEL,
     UNITED STATES MAGISTRATE JUDGE